First case for argument is case number 20-1844, Eastern Arkansas, Angelique Tilghman v. Allstate Property & Casualty Insurance Company, et al. Counsel? Thank you, Your Honor. Good afternoon, and may it please the Court. We are Brian Wallace on behalf of the appellant, Angelique Tilghman, and we have reserved three minutes for rebuttal time. Everybody knows that Allstate turned its claims process into a money-making scheme by low-balling small-to-medium-sized claims in order to make a profit off of its insurance. Despite being called on this repeatedly and entering into an agreement with multiple state insurance commissions, including the state of Arkansas, to stop its unfair claims practices, Allstate is continuing to do this. This is what this case is about, and Angelique Tilghman is one of those insureds that has been harmed by Allstate's continuation of its settle-for-X-or-less default-to-trial claims practices. Once Tilghman or other insureds are subjected to Allstate's bad-faith claims handling abuses, they sustain other injuries beyond a breach-of-contract injury. This is what happened to Ms. Tilghman, and it's also why the jury's decision on the breach-of-contract claim is not decisive of the bad-faith claim. Here, the district court's grant-of-summary judgment to Allstate was based on an absence of proof in the record showing bad faith, and therefore was derivative of its order denying access to discovery related to those bad-faith claims. Consequently, if this court holds, as appellant's request it does, that the district court erred in denying the discovery that that erroneous ruling resulted in a fundamental unfairness and prejudice to Ms. Tilghman requiring reversal of both decisions. Moreover, unlike this court's recent opinion in Amador v. 3M, a fundamental unfairness occurred because Tilghman was denied discovery regarding Allstate's state of mind when handling the claim, what processes, policies, etc. it used in doing so, and as we detailed in the briefing, other specifics held only by Allstate which were relevant and proportional to Tilghman's bad-faith claim. In other words, a bad-faith claim is not a mere abuse of discretion, but a gross abuse of discretion, and that's really quite demanding. Now, in order to do that, you have to balance that with the rule, and the rule talks about proportionality. Now, if you look at this particular case, what are the specific facts that you had in your possession that would lead to believe that this discovery was tailored narrowly to fit the scope of discovery under that proportional standard? Your Honor, you're correct. It is a taxing standard. However, it is met in this instance, and we know this because the facts detailing the bad faith were very well laid out in the complaint. There were multiple paragraphs going over what Allstate has done historically, what Allstate continued to do, and what Allstate did with Ms. Tilghman. It was also pled that this discovery would be held in the hands of Allstate, so we would need to get it from them. Some specifics that I've identified were paragraphs 500-502, 506-508 of the complaint on Appendix 73-75, where Allstate continued to use Colossus for the purpose of substituting evidence that went against its position, for instance, the impairment rating. Our expert, Mr. Fye, whose affidavit was attached to the reply for the motion to compel, discussed how this was a classic case of applying the settle for X or less company philosophy, which they had agreed to stop doing. They also agreed that they would implement certain policies and would not rely solely on Colossus when evaluating claims. As was pled in the complaint and also argued below and in the briefing, the claim files, the policies that they had, what they did when evaluating this claim were relevant to and proportional to the specific case that is brought here. Another specific instance would be, which has been found to be bad faith in Arkansas, which would be under the Merrill case, which would be turning a blind eye to the law applicable in the state regarding what damages can be shown and the actual proof that the insured gave to the company for evaluating the claim. For instance, in this case, because Miss Tillman hired the Cheney's to represent her, Allstate evaluated the claim differently. That has specifically been held to be evidence of bad faith or evidence to support a bad faith in Arkansas law. But as I, as I saw the record, I, I thought maybe it went to her advantage. Didn't it? Didn't they sort of come to the table quicker because of that? No, your honor. They didn't come to the table quicker because of that. They what they did is they put her information into a box, which was a minor impact soft tissue box. And when they do that, they put it into Colossus and they, it spits out a number and that's the number that they gave. They, when they were presented with evidence, such as a chiropractor's. Future impairment, future medical information, which Arkansas recognizes 1 of the Allstate supervisors told the claims handler do not consider that you cannot consider that we don't consider that that's completely in conflict with Arkansas law, which allows chiropractors to provide such testimony. And we provided Allstate with not only that information, but with the cases and also medical journal articles and things like that showing this correlation. So, well, the maximum on this policy was what? I believe it was 50,000, your honor. And she was ultimately offered 40, correct? Yes, your honor. So, so even if you've got a theory about sort of general practices within the company. It seems to me you've got to specifically attach your evidence to her case because she's a single claimant here, a single plaintiff. And how do you do that with such a small range between the amount offered and the maximum amount under the policy? Because of the distinction between a breach of contract claim and a bad faith claim, the bad faith claim looks at how they evaluated whether they their state of mind when looking at this claim and performing the evaluation here. And this goes to why we needed the discovery and the claims file and why it doesn't matter what they. Ultimately, what the jury verdict was, or what they ultimately settled after going back and forth a little bit more is that we specifically requested the reserve set for the claim the claim file and all the evaluations. These documents may have shown that all state knew the claim was worth more, but negotiated for a lesser amount instead under Finley and Newton. These are evidence of bad faith. But isn't the value of the claim established by the jury's verdict? I mean, because that's the number that the jury says made your client whole and complete under the for the loss that she incurred as a result of the automobile accident. And when you offer three times the what the jury thinks the case is worth, aren't you by definition just swimming upstream on this claim that there was some bad faith? No, your honor, the jury's assessment of the testimony is different from what the insurer does who purposely disregards. Proof this isn't just a mere failure to investigate a claim as previously stated, it's all states will for blindness and conscious disregard of the what the law is and the evidence and is evidence of all states. And state of mind, and this is this is why it's such an important distinction in Arkansas law is that a breach of contract claim is not required to sustain a bad faith claim. In engine cited in our briefing the court. Originally, there was a breach of contract claim brought as well as a bad faith claim. The breach of contract claim was settled and it was allowed to go to trial on the bad faith claim. Though Arkansas does not require there to be a breach of contract for all for a insurance company, such as all state to engage in bad faith practices. And that is what we had here is we had allegations very detailed in the complaint. We had we had an affidavit from an expert saying, based on what's been pled based on what I've seen in other cases based on what I've looked at. This is what all state continue to do here and. About that affidavit, you know, judge Miller essentially described it as a hunch leading to a hopeful fishing expedition, right? I mean, that's, you know, he didn't use exactly those words, but but that's an old trial judge. That's what I hear him saying. And why is he wrong? Well, 1st, a fishing expedition is no longer a valid objection to discovery and when when proving a bad faith claim, the documents almost always hit lie in the hands of the insurer. And here the claims file, I mean, it is entirely possible that the claims file may have shown we were wrong, but we don't know that because none of these documents were turned over. We didn't he didn't have the our expert didn't have the ability to take those documents and compare them to what has been found to be bad faith claims practices and claims handling to what was done in this case. We were basically handcuffed in trying to prove our case without the actual documents that could prove the case. We were left to only rely upon these allegations. And as you just put it, the hunches of the insurance experts, because there was no documents to actually look at and to consider, which goes to the fundamental unfairness of the court's decision to dismiss the bad faith claim for a lack of proof. Because we weren't allowed to get the proof. The court denied us the ability to get to proof. And even when all state said they would turn over documents with a protective order, all state never sought that protective order, nor did they turn over any of those documents. Runners, I see I'm about to run into my rebuttal time. I will go ahead and pass to miss running at this time, unless there's a further question to follow up on that statement. I just made. I see none. So thank you. And you may reserve the rest of your time. Thank you. Council, we're ready to hear from you. Having a little technical difficulties. I don't know if you're not if you're not unmuted yet. Let's try that. Is that working? Yes, that sounds much better. Good afternoon, Your Honors. May it please the court. My name is Emily Runyon, and I can tell the technical difficulties with my screen. But is my audio remaining? I am able to hear you. And if the others not, I think everyone is able to hear your argument. Right. Thank you. I was honored to represent all state in pretrial litigation and at the trial of this matter in March of 22, 2020. There are two issues that we are here about today from appellant one being discovery rulings and the other regarding the summary judgment ruling. Before I go into, I believe that the discovery rulings really kind of roll into what the judge ended up doing on the summary judgment. So I'd like to start with those discovery rulings. However, I also want to start first with the main issue that has been touched on here is that there cannot be prejudice shown and damages shown in this case. The bottom line is that this case was a claim by Miss Tillman. All state did agree to coverage for UM coverage when she was hit by someone that did not have insurance and the policy at issue was $50,000. The initial offer on the case was 32 before a complaint was ever filed against all state. The last offer was 40. The issue ended up in front of a jury of her peers and they decided it was worth $12,000. So the only evidence in this case is that all state actually overestimated Miss Tillman's claim. So whatever the company did in the handling of her evaluation resulted in an overestimation by quite a bit in what her claim was actually worth. Therefore, she cannot show prejudice and she cannot show damages. Even a bad faith claim requires the showing of damages. Counsel is at your position that even had the plaintiff been allowed this additional discovery, there's no way that the jury verdict would have been any different. That is correct, your honor. That is exactly all states position. And if you start looking at first off, I don't believe that if you look at everything that the judge was looking at, I don't think you're going to find a gross abuse of discretion on any of the discovery rulings. However, the bottom line is, even if you did disagree or if you put yourself in that position as the judge and you thought, well, I think I would have handled that a little different. You aren't going to find a gross abuse of discretion, but even if you did and the floodgates opened and all state had to produce everything in its company, it would not have changed the jury verdict. It would not have changed the outcome, but I do want to know that for sure, since we don't know at all what's in there. I mean, because the argument of opposing counsel is clearly that, you know, you deprive us of any opportunity of finding out what your policies are, what you've been doing, what your state of mind was when you were making these decisions. And by doing that, we were deprived of an opportunity to develop our case. The judge took away our bad faith case, you know, and I get the idea where, you know, I don't know what the custom and practice is in Arkansas. You know, in North Dakota, our practice has always been to bifurcate the bad faith claim from the underlying claim. You try the damages case first, and then you try to the same jury. You try the bad faith claim over so that the bad faith claim doesn't bleed into the to the damages claim. Now, opposing counsel is arguing that you don't need to show the breach of the contract in order to get to the bad faith claim. And, you know, if you never know what the evidence is, I mean, how do we really know? Sure, I'd like to touch on that for certain. I would like to start with telling you what they did have to consider and what the district court knew that they had to consider when they filed their motion to compel. So in May of twenty eighteen, all state did respond to discovery. And while it had to make objections to the overbreadth and the proportionality, it did not just serve objections. It gave all the policy documents that were relevant to Tillman's claim. It gave the while there's all this discussion from appellant about not having the claim file. They had the entire claim file only with redactions for privilege. And that was a three thousand five hundred and twenty four page claim file that was produced. And in the grand scheme of things, there was only one hundred and forty pages or portions thereof. So less than one hundred and forty pages that had redactions. So it had the policy documents. It had the claim file. And before a complaint was ever filed against all state, it also all state also produced the one colossus report that was ever done in this evaluation. So there's a whole lot made of this. Well, they're still using Colossus. Well, the agreement with the insurance department was that they could use Colossus. There was just certain it was how they used it. And they turned over the one colossus report that was done in this case. So they got claim file information. They got certain reserve information. While some reserve information was redacted after attorneys got involved and there was attorney client privilege. They had all of that to consider and they got that in May of twenty nineteen. By the time the motion to compel was filed nine months later, they had not done anything except argue with all state about all state's objections and what all state wasn't turning over in the in the realm of company documents and corporate documents. And in that claim file, what's interesting and I think very telling about what Miss Tillman's counsel was really after in this case, the claim file had thirty eight different claim handlers and claim specialists and the information and what they did in this case. Everybody that touched it, that information was all all there. And the only thing that all state got was a 30 very broad 30 B6 notice for a company rep to talk about corporate things that had happened decades ago. And there's a very good discussion in appendix page four fifty six through four sixty. It would take me all of my time to discuss what happened in the past with all state and the agreement. But that's all they wanted was a 30 B6 to discuss all of these things that were not relevant to Tillman's claim, which was evaluated in twenty fifteen. Never once did they ask to depose actually the claim specialist in the claim handlers that were involved in Miss Tillman's claim that evaluated it, that had their hands on it, that could have told them how they did it. They didn't depose any of those people. So when they came to the court with their motion to compel asking for all these other documents, they could not make a neck, they could not make a connection and they could not tie what happened in Miss Tillman's claim to all this speculative information about why they think they should get all these documents. I mean, basically what they were telling the court is because we put bad faith in our complaint and because we've alleged bad faith that we're entitled to all of these different categories of documents. And when they were arguing the motion to compel in front of the court, they did not narrow that down and say court. Really, what we're looking for is, you know, numbers twenty eighteen five and seven. And if you can look at those and if you could, you know, really what we're looking for is this. And we're willing to enter a protective order and we're willing to narrow the scope because this is really what we're looking for. Instead, much like the brief that's been filed in this case, there's just broad categories of information that they think they're entitled to because they have simply alleged bad faith. Regarding the protective order, you know, all state had not been asked by the court to produce additional documents because the court didn't find that there was that necessity. Regardless, all state never withdrew its offer to produce certain things. It said, you know, all state was trying to be reasonable and said, hey, we'll produce these certain things we think are relevant to Miss Tillman's claims. But they are documents that anytime we've ever had to produce them, they've been subject to a protective order. So if you'll agree to that, we won't. And the reason that opposing counsel would not agree to the protective order was because it would not our our suggested protective order would not allow him to use the documents in other cases. And we had a discussion between the two of us about how does that help Miss Tillman to the detriment of your own client? You won't sign this protective order because it won't allow you to use it in other cases. And so counsel is anything about that protective order? Is that in the record? I read that in the briefing, but did that ever get to the court? It did. And that discussion, it was it was attached to some pleadings as exhibits, but you can find it at Appendix 1599 and 1600. As far as the discussion between counsel, you can see it in emails. As far as an order on the protective order that never came in front of the court, because, you know, while all state was saying, hey, we would agree to this protective order, other opposing counsel would not agree. And the issue never came before the court because opposing counsel never came to the court and said, hey, even though you told all state they didn't owe these things, they're willing to give us these things with a protective order. But we can't agree on it and we don't think they should get what they're asking for. So here are these protective orders. Which one do you want to enter court? Because we want these documents. They never did that. So there's no ruling on the issue about the protective order and there's no ruling on the documents that all state was willing to hand over in the end. So, you know, that is really the lens that the court was looking through when it needed to decide, am I going to grant this motion to compel or deny it? You know, he had to take all of that information and everything that the plaintiffs had been given and what they hadn't done with it. And then he also had to look at what is this case really about? I mean, that's what twenty sixty one asks him to do. What is this case actually about? And at that time, what the court knew was that this case was about an NBA that happened in 2010. Miss Tillman was twenty five at the time. She had already been found one hundred percent disabled by the Social Security Administration. It only cost you know, it only cost four hundred dollars worth of property damage. She didn't suffer any broken bones, no serious injuries, no cuts, no abrasions. She had several previous accidents which she claimed personal injury from. She had several after that she claimed personal injury from. And, you know, again, in the end, he also had to realize there was only ten thousand dollars left. They were all state was getting all of these allegations against it for not offering the last ten thousand dollars of their their policy limits. And Miss Tillman was treated, you know, by five chiropractors, a dentist and a PCP. And, you know, a PCP that PCP ended up. This was a discussion in all states response to the motion for summary judgment. That PCP ended up as a witness that was in the unfortunate situation of having to testify that he actually didn't author a report that was given to all state in support of Miss Tillman's claim. So all of these things go into this consideration of what does the court want to do? And one year later, when no depositions have been taken by opposing counsel, they've done nothing with the discovery they did have. He has to decide, am I going to continue this case that's been pending for nine years? And he decided he wasn't going to do that because they had not proven that they have not had not proven that they had entitlement to these documents. And there just can't be a gross abuse of discretion in those findings. And if you look at the cases cited by appellant for these, just every rulings and saying that when you add bad faith to the claim, you get all these documents. There's four main cases they cited. Only two were in Arkansas. One was all state versus Dodson, which wasn't a bad faith case. And one was from 1992. And in that case, that was the Viking case. That case was cited over and over and over, saying that it stood for the notion that carriers files were critical to the discovery of the truth. Well, if you actually look at that case, there was a conversion claim in that case, as well as a bad faith claim. And that line critical to discovery of the truth was in the court's discussion on page 323 of the conversion claim, saying that, you know, if you've got different portions of a claim file, like there was a salvage section in that one. And they hadn't produced all of the sections of the claim file. So that's not at all akin to what happened here. The claim file was fully produced. It just had redactions that council made objections on. And then you turn to the motion for summary judgment of bad bad faith. You know, that was filed by all state in May of 2019. And rather than it being responded to on the merits, it was responded to by, again, asking for more time for discovery. And I think it was as was touched on earlier. It was an affidavit, not of the party or not of an attorney saying here are the specific facts that we think exist and why. It was from an old expert that, again, was grasping at straws from something that happened decades ago and not what happened in Miss Tillman's claim in 2015. And there was plenty for him to look at in what all state had produced at that time. So, again, Your Honor, I don't believe that any of those decisions were in error by the district court. And for those for those reasons, I would ask that this court affirm the district court's rulings. I want to just ask one really brief question. You know, there's been some conversation that, well, 40,000 is close to 50,000 and that that's, you know, magical. And it may be, in the right case, magical. But you would concede that there are times when if you offer $49,000 for the settlement of an automobile injury with a $50,000 policy limit that it may be in bad faith. For example, you have, you know, Mike Trout is killed in a car accident. He's lost $25 million a year over the next, you know, 10 years. If you don't pay the 50, that that would be in bad faith, wouldn't it? I mean, I agree that on a certain on a different case with different facts, you might. I don't think that $10,000 is really a magic number at all. I think what's magic number in this case is that what the offer was was 40 and what a jury of her peers said the claim was worth was 12. That's the magic number. Yeah, very good. Thank you. Thank you. Thank you, counsel. And now we're ready for rebuttal. Thank you. Your honor's bring Wallace again for the appellant. I want to touch on a couple of things that that were brought up during Miss Runyon's argument. She said that all state turned over what it thought was relevant. It's not the standard. The standard under rule 12, 6 looks at six specific factors to determine proportionality here. The court, presumably because it went to the overbroad proportionality discussion. Found that these were relevant documents and the discussion of, you know, oh, we gave them something with redactions and we said they were privileged that, you know, just saying something is privileged and attorney client privilege without producing more, without producing an affidavit, without providing those to the court for an in camera review. Doesn't just give all state carte blanche to not turn that over or to redact it. Moreover, they ask for an in camera review. It's not our responsibility, but I believe it was requested within the motion to compel her in the reply when they brought up the privilege argument, but that's not our responsibility. And that goes also to a boilerplate objection. The notes on use of rule 26, specifically says a boilerplate, overly broad and proportionate, not proportional objection is not sufficient affidavits. Other things must be put forward to show that all state did not do that here. Instead, as the court relied upon below, and what was done is it was just counsel argument saying it's not relevant. It doesn't matter. The reason why an abuse of discretion occurred here is that in US versus Taylor, the United States Supreme Court said care must be taken to ensure a district courts discretionary choices are guided by sound legal principles and not the courts inclination here. The courts inclination was, as all state just argued, this is just a breach of contract claim. It's a low property damage claim, but there was a bad faith claim here. There were specific allegations of bad faith. And this is why the policies and the practices are so vital to determining a bad faith claim and why that discovery should have been turned over and why there was such a fundamental unfairness here that resulted from that denial. It's how they used Colossus that matters. They say, oh, there was only one Colossus report. Well, the claims adjuster said, oh, we reevaluated. We did other things. We did this. Well, what are those other things that you did? Where's that claims diary that sets that out? Where is that in the claims? I see I'm out of time. Your honors. Thank you so much for the privilege of being here today. Well, we thank both counsel for your arguments here today. We will take the matter under advisement.